Edmonds, J.
 

 There was originally a dispute between the states of New York and Massachusetts as to a large tract of land of which the
 
 locas in quo
 
 was a part. In 1786, that dispute was settled, by a cession from Massachusetts to New York of the government, sovereignty and jurisdiction of the lands in controversy, and by a cession from New York to Massachusetts of “the right of pre-emption of the soil from the native Indians, and all other right or title of New York” to the same. The lands were then in the independent occupancy of a nation of Indians, and were owned by them, and all that Massachusetts acquired by the cession to her, was the exclusive right of buying from the Indians, when they should be disposed to sell. This right was duly vested in "Ogden and Fellows, by proper conveyances from the state of Massachusetts, and they thus became seised of all the white man’s right over these lands, except that of sovereignty, which still remains in the state of New York.
 

 The Indian title, however, was not yet extinguished, and the Indians were in the actual possession of the land, and before Ogden and Fellows could enjoy any benefit from this grant from the state of Massachusetts, it was necessary for them to acquire the Indian right. Various steps were taken for that purpose; it is unnecessary here to enumerate them. It is enough, for the purposes of the question now before us, to know, that in May 1842, a conveyance from what purported to be the chiefs and headmen of the Seneca nation of Indians was executed to Ogden and Fellows, with the assent of an officer of the state of Massachusetts and a commissioner on the part of the United States, by which
 
 *412
 
 * 412 1 ** waS a§ree<^ *Indian title to four dif- -* ferent tracts of land, known as the Buffalo, the Cattaraugus, the Allegeny and the Tonawanda reservations was valued at $202,000, that the Indians should retain the occupation and enjoyment of the Allegény and Cattaraugus reservations, and they thereby conveyed to Ogden and Fellows the whole of the Buffalo and Tonawanda reservations; that the Indians should be paid the consideration for that grant, as follows: $100,000 should be regarded as the value of their title to the whole four tracts, and $102,000 as the value of their improvements on the same four tracts, and so much of those sums should be paid by Ogden and Fellows, as.„the value of the title and improvements on the Buffalo and Tonawanda tracts should bear to the value of the title and improvements on all the tracts; such amount to be determined by arbitrators to be chosen as therein mentioned.
 

 Those arbitrators were to employ suitable surveyors, to explore and examine to ascertain the entire quantity in all the tracts, and award and determine the amount to be paid to each Indian, for his improvements on the two tracts conveyed. And Ogden and Fellows were to have possession of the forest lands, within one month, and of the improved lands, within two years, after the report of the arbitrators should be filed in the war office, provided that the amounts awarded for improvements should, on the surrender of the possession, be paid to the president of the United States, to be distributed among the owners of the improvements, in the sums awarded to each by the arbitrators. This indenture was incorporated into and formed part of a treaty made at the same time between the United States and the same chiefs and headmen.
 

 Afterwards, arbitrators were appointed agreeable to the terms of the treaty and indenture, and they executed their duty as to all the four tracts, except the Tonawanda (in which are the premises in question). They awarded that $75,000 was the proportion which the value of the two tracts conveyed, bore to the whole four tracts, and $58,768.96 was the proportion which the value of tjae improvements on those two tracts bore to the improvements on all the tracts. But they „ ^ were unable to award as to the amount to be ^ paid to each individual for his improvements on the Tonawanda tract, for the reason, that that portion of the nation which was in possession of that tract refused to let them perform their duty in this respect, and removed them by force from the tract, when they went there, as they did twice, for the purpose of making their examinations and award. Such award has never yet been made, but at the end of the two years, after filing the report in the war-office and upon the payment to the president of the United States of the aggregate sum awarded by the arbitrators, Fellows, as the survivor of his joint-tenant, Ogden, entered by force,'and ejected the plaintiff from the improvements possessed by him. Those improvements, which consisted of a dam and saw-mill had been made by the plaintiff and seven other native Indians, twenty years before, and were in the actual occupation of him, at the time the defendants entered into and took possession of the close and turned the plaintiff out.
 

 Upon this state of facts, the jury, under the charge of the court, found a verdict for the plaintiff. On the trial below, the court ruled, that the defendants had failed to .make out any title or right of possession, and refused to charge that Fellows had made out a title to the close in question; that Fellows, at the end of the two years, was entitled to the possession, notwithstanding the omission of the arbitrators to award as to the amount to be paid to the plaintiff as the value of his improvements; that such failure of the arbitrators could not prejudice Fellows, unless it had been caused by him; and that the plaintiff, as an individual Indian, could not maintain
 
 *413
 
 the action. The supreme court, at general term, denied the motion for a new trial, on the ground, that the award of the arbitrators in full, as required'by the indenture of conveyance and the treaty, was a condition precedent to the grantee’s right of possession. '
 

 The first point taken on the argument was, that the plaintiff could not maintain an action, individually, for trespass on lands belonging to the whole nation. * 414 1 ^-^is ™ight be true, if the action was founded -* only upon title. So, it might be true, if it was founded upon the occupancy in common, which, we know, is usual with the Indian tribes. But this action is not founded upon either basis, but upon the separate possession of the plaintiff. The bill of exceptions shows that he was, alone .and separately from all others, in possession of the
 
 locus in quo,
 
 when the trespass was committed, and that was enough, to enable him to maintain an action for a wrong done to that possession.
 

 The chief question, however, is, whether Fellows had a right to the possession, before the arbitrators awarded in full. His claim to the possession rests upon the conveyance which was
 
 in prsesenti,
 
 and absolutely, of the fee in the premises. That of itself might confer upon him the right of possession, if there was nothing else in the case; but the conveyance under which he claims, so far from carrying with it this as a necessary incident to the title, expressly reserves the possession from him, until the happening of a certain event, namely, the filing in the war-office of the award which the conveyance required.
 

 It is very clear, that he was not entitled to possession, by virtue merely of the conveyance
 
 in prmsenti
 
 of the absolute title, but only upon the happening of a contingency, and it was necessary for him, in making out his defence, to show that the contingency had happened. He, accordingly, attempted to do so, and-proved that an award had been filed as required. But was that all that
 
 *414
 
 was necessary? Was it not also necessary for him to show, that it was such an award as the conveyance and treaty required ? Instead, however, of showing that it was such an award, his evidence showed that it was not; he then proved an excuse why it was not, and sought to give to that excuse for non-performance the same force and effect that properly belonged to performance. Whether he could do that, is the question now before us.
 

 There is no particular form of words necessary to constitute a condition precedent; the true test is the intention of the parties. And it is very evident to me, that it was the intention *of the parties, that f the occupiers of the land should not be com- *- pelled to give up .the possession of them, until two conditions had been complied with; one, that such an award should be obtained and filed in the war-office; and the other, that the value of the improvements should be paid to the president, and the consideration for the conveyance be paid or secured to the satisfaction of the secretary of war. The language in which that particular stipulation is clothed, conveys that impression to my mind, and there is another provision that carries the same idea. I mean, the provision that
 
 “
 
 any Indian having improvements may surrender them, prior to the expiration of the two years, upon the amount awarded to him for such improvements being paid to .the president, or any agent designated by him for that purpose.” I regard the parties to the conveyance, then, as having stipulated, that the occupiers of the land shall not be compelled to surrender their possessions, until there shall have been obtained and filed in the war-office an award, which shall determine the amount to be paid to each individual Indian for his improvements.
 

 The parties had a perfect right to make such a stipulation ; there is nothing unreasonable or unconscionable in it; nothing, indeed, to make it void; though, as it
 
 *415
 
 stipulates as to the action of third persons, there may be something to make it difficult to perform. That difficulty, however great it may be, is not enough to make the stipulation nugatory, or authorize its being dispensed with. It is like the familiar case of insurance, where the conditions provide, that before the insurers shall be compelled to pay the loss, the insured shall procure a certificate from a neighboring magistrate, minister or churchwarden, and where, it is well settled, that however unreasonable the refusal to give such certificate may be, the insured cannot recover without it. In that case, the court have said — “ If there be a condition precedent, to do an impossible thing, the obligation becomes single, but however improbable the thing may be, it must be complied with, or the right which was to attach on its being performed does not vest. If the condition . „ _ be that A. shall enfeoff B., and *A. do all in his v "J ^ | e power to perform the condition, and B. will not receive livery of seisin, yet, from the time of Lord Coke to the present moment, it has not been doubted, but that the right which was to depend on the performance of that condition did not a-rise.”
 
 (Worstly
 
 v.
 
 Wood,
 
 6 T. R. 710.)
 

 I know of but one mode of avoiding the compliance with the condition, in such a case, and that is, where the party exacting the condition prevents its performance; in that event, his act of prevention is tantamount to a performance. But to produce that effect, such prevention must come from the party exacting the condition, and not from him in whose behalf or to whom it is to be performed. As, in the case put in 6 T. R, if C. exacted as a condition, that A. should enfeoff B., B.’s preventing the enfeoffment, by refusing to receive livery of seisin, would not be tantamount to a performance; though.if C. prevented it, if would; for C. had, in fact, stipulated for the acts of both A. and B., as the acts of both were necessary to the feoffment created..
 
 *416
 
 Thus, in a covenant in a charter-party, to pay the value of reshipping, in case of capture, &c., provided it should appear to a court-martial, that the captain had made the best defence, the holding of a court-martial was held to be indispensable as a condition precedent.
 
 (Davidson
 
 v.
 
 More,
 
 3 Doug. 28.) So, in case of an agreement to pay for repairs, on an architect’s certifying they are done, &c., such certificate is essential.
 
 (Morgan
 
 v.
 
 Birnie,
 
 3 M. & S. 76; s. c. 9 Bing. 672.) So, if a party stipulate that a horse shall trot eighteen miles within an hour, to the satisfaction of K, N.’s satisfaction must be obtained, before there can be a recovery.
 
 (Brogden
 
 v.
 
 Marriott,
 
 2 Bing. N. C. 473.) So, if a man covenant that his son shall marry the covenantee’s daughter, her refusal will not discharge the covenantor. And so, where goods were bought, subject to.the valuation of A. and B., and A. refuse to value. (Chitty on Cont. 572-3;
 
 Cook
 
 v.
 
 Jennings,
 
 7 T. R. 384;
 
 McNeill
 
 v.
 
 Reed,
 
 9 Bing. 68).
 

 In all these cases, which were stipulations for the acts of other parties, the language of the courts has always been, in answer to complaints about the difficulty of performance — “You have so agreed, and you must so perform; you ought to *have protected yourself in your agreement against the consequences; having omitted to do so, the court cannot do it for you.” These principles seem to be directly applicable to and decisive of the case before us. [ *417
 

 Ogden and Fellows say fit to stipulate that they should have no right to the possession of the lands conveyed to them, and that the individual Indians in possession should not be disturbed, until a particular award, determining certain specified matters, should first be obtained and filed in the war-office. To effect that purpose, the acts of several persons, strangers to the contract, were necessary; those, namely, of the secretary of war, of the arbitrators, and their surveyors, agents and witnesses. They chose so to agree, and it is not in
 
 *417
 
 the power of any one, except the chiefs and headmen with whom they contracted, to release them from the stipulation. Those chiefs and headmen have not released them, nor have they done anything to prevent or waive a strict performance. The plaintiff and those who were associated with him in preventing the arbitrators from going on to the premises, were not parties to the contract; they were not of those chiefs or headmen; and their acts can no more be regarded as waiving performance, than that of the secretary of war, if he had refused to appoint an arbitrator, or, if no person could be procured to act as arbitrator, nor than the refusal of the churchwardens, in the case of the insurance.
 

 And besides, it does not anywhere appear, that the arbitrators could not have made the individual valuation required. They were, it is true, prevented by the plaintiff and others from going on to the premises, but did it necessarily follow that, therefore, they could not make such valuation; that they could not take testimony off the tract, and from that testimony perform their duty, as well as from a personal examination? There does not seem to have been any such absolute necessity for their making a personal examination as they seem to have supposed; for they seem to have readily arrived at the aggregate of such valuation, without such view, and * 418 1 ^ *s n°* easy *f°r us conceive, why the parts -* which went to make up that aggregate could not have been stated.
 

 In this view of the case, it becomes unnecessary to examine another point agitated on the argument, whether the conveyance to Ogden and Fellows vested a good title in them. Because, if it did, they were not, by -the express language of the conveyance, entitled to the possession, until the performance of a condition which has been neither performed nor waived.
 

 And I put my opinion solely upon the ground that
 
 *418
 
 the condition precedent to the right of possession has not been performed. Fellows was, therefore, a trespasser, and the judgment of the supreme court ought to be affirmed.